**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

—————————————————————— :
                                                :
JASON ANTHONY W., et al.,                       :
                                                :        Case No. 2:20-cv-3704 (BRM)
            Petitioners,                         :
                                                :
            v.                                   :        **OPINION**
                                                :
WILLIAM J. ANDERSON, et al.,                     :
                                                :
            Respondents.                         :
—————————————————————— :

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241 filed by

Petitioners Jason Anthony W., Melvin A.A., Juan F.S.L., Guanglei J., Jiaqiang X., Isaias R.A.,

Tieku A., Nery A.C.M., Isaias N.C. and Nicolas M.M. (collectively, "Petitioners").[1] (ECF No. 1.)

Petitioners are individuals in the custody of the United States Department of Homeland Security

("DHS"), Immigration and Customs Enforcement ("ICE") who are detained at facilities in New

Jersey during the pendency of their removal proceedings. On April 6, 2020, Petitioners filed their

Petition (ECF No. 1), and the following day, filed an Emergency Motion for Temporary

Restraining Order ("Mot.") (ECF No. 7) requesting the Court order their immediate release from

detention. Respondent filed Opposition to the Motion ("Opp.") (ECF No. 16) and, on April 14,

2020, the Court held oral argument (ECF No. 17).

Having reviewed the Petition and the parties' submissions, heard oral argument, and

examined the applicable law, the Court grants Petitioners' Jason Anthony W., Jiaqiang X., Tieku

———————————————————

[1] After the filing of the Petition, Petitioners Guanglei J. and Isaias N.C. were released from custody. This Opinion addresses only the remaining eight Petitioners.

A., Nery A.C.M. and Nicolas M.M.'s Motion[2] and orders Respondents to immediately release Petitioners subject to the conditions set forth in the accompanying order.

## I. BACKGROUND

### A. COVID-19

The Court need not re-state all that has been written in many court decisions throughout the country about the COVID-19 pandemic wreaking havoc around the world.[3] Suffice it to say, both parties agree this is an unprecedented public health crisis with a profound effect on the population at large, and institutions such as jails and prisons in particular. COVID-19 is "spread mainly from person-to-person" and can occur (1) between persons who are in close contact,

---

[2]At this time, the Court will only grant the TRO Motion for Petitioners Jason Anthony W., Jiaqiang X., Tieku A., Nery A.C.M. and Nicolas M.M. As discussed below, the Petition and TRO Motion seek release on the theory of a substantive due process violation for subjecting Petitioner to the "punishment" of potential exposure to COVID-19. According to Petitioner, for Melvin A.A., Juan F.S.L. and Isaias R.A., and confirmed by the Government with regards to Melvin A.A., these individuals are now presumptive COVID-19 positive. Accordingly, because it would appear their claim is now one sounding in denial of proper medical care for failing to treat their COVID-19 medical needs, and not based on potential exposure, the Court finds further briefing and information from both parties is needed. The Court will therefore reserve decision as to these three individuals and set a short schedule in the accompanying order.

[3] *See*, *e.g.*, *Jeferson V. G. v. Decker*, 2020 WL 1873018 (D.N.J. Apr. 15, 2020); *Marvin A. G. v. Decker*, Civ. Act. No. 20-1689 (D.N.J. Apr. 14, 2020); *Rafael L.O. v. Tsoukaris*, 2020 WL 1808843 (D.N.J., 2020); *Bent v. Barr*, Civ. Action No. 19-06123, 2020 WL 1812850 (N.D. Ca., Apr. 9, 2020); *Thakker v. Doll*, 2020 WL 1671563 (Mar. 31. 2020); *Basank v. Decker*, Civ. Action No. 20-2518, --- F. Supp. 3d., 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020); *United States v. Veras*, No. 19-10, 2020 WL 1675975, at *3 (M.D. Pa. Apr. 6, 2020) (release request pursuant to 18 U.S.C. § 3142(i)); " *United States v. Raia*, No. 20-1033, 2020 WL 1647922, at *1 (3d Cir. Apr. 2, 2020) (compassionate release request pursuant to 18 U.S.C § 3582(c)(1)(A)(i)); *United States v. Patel*, No. 20-14001, 2020 WL 1698785, at *1 (D.N.J. Apr. 8, 2020) (release request pursuant to 18 U.S.C. § 3142).

meaning within six feet, and (2) by respiratory droplets when an infected person sneezes, coughs, or talks. *See Rafael L.O. v. Tsoukaris*, Civil No. 20-3481, 2020 WL 1808843, at *2 (D.N.J. Apr. 9, 2020) (citing How Coronavirus Spreads, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html (last accessed April 8, 2020)). The virus can also be spread by infected persons who are not showing symptoms. *Id.*

Symptoms of COVID-19 can be mild, but as relevant here, the Centers for Disease Control and Prevention has identified several groups of individuals who are at higher risk for severe illness from COVID-19: individuals 65 years and older; nursing home/long-term care facility populations; and those with underlying medical conditions such as chronic lung disease or moderate to severe asthma; serious heart conditions; immunocompromised due to cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications; severe obesity; diabetes; chronic kidney disease undergoing dialysis; liver disease. *See* People Who Are at Higher Risk for Severe Illness, CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last accessed April 15, 2020).

### B. Petitioners' Underlying Medical Conditions

Petitioners submitted declarations outlining their specific medical conditions, which they argue put them at heightened risk of COVID-19 complications.

Petitioner Jason Anthony W. is a 28-year-old man who is currently detained by ICE at Essex County Correctional Facility ("ECCF"). (Johnson Cert. ¶ 7, ECF No. 2-6.) He suffers from a large polyp in his left nostril, which obstructs his breathing passage. (*Id.* ¶ 9.) He currently uses

a steroid spray to treat the polyp, but doctors have recommended surgery. (*Id.*) This polyp has grown and has occasionally gotten so large it hangs from his inside his nose. (*Id.*) According to Dr. Sugarman, anyone with respiratory difficulties, such as Petitioner Jason Anthony W., "is at exceedingly high risk of dying from COVID-19," and the steroid he uses may suppress his immune system, putting him at even greater risk for COVID-19. (Sugarman Cert. ¶ 10.) At the hearing,[4] the Government did not oppose Petitioner's argument that usage of the steroid compromises his immune system, which places him in a high-risk category according to the CDC. The Government nevertheless opposes release because his detention is not unconstitutional.

Petitioner Melvin A.A. is a 42-year-old man who is currently detained by ICE at the Elizabeth County Detention Center ("EDC"). (A.A. Cert. ¶ 4.) Petitioner Melvin A.A. was diagnosed with high blood pressure and has recently begun suffering from a sense of constriction in his chest, shortness of breath, headaches, and a scratchy throat. (*Id.* ¶¶ 7-8.) After alerting the medical unit, he was given ibuprofen and allergy medicine, even though he states he does not have allergies. (*Id.*) Dr. Sugarman states Petitioner Melvin A.A. is at high risk of severe illness or death if he contracts COVID-19, given his high blood pressure. (Sugarman Cert. ¶ 11.) During oral argument, the Government updated Petitioner Melvin A.A.'s status and informed the Court he was considered a presumptive positive for COVID-19 and placed into medical isolation. According to the Government, Petitioner's symptoms do not currently require outside care. At the hearing, Petitioner's counsel advised they did not have any information about his treatment. *See supra* note 4.

---

[4] A transcript of the hearing, held only recently, is not yet available. The Court has summarized its contents to the best of its recollection and using its contemporaneous notes.

Petitioner Juan S.L. is a 40-year-old man who is currently detained by ICE at ECCF. (Khandwala Decl. ¶ 7, ECF No. 2-8.) Petitioner S.L. has been diagnosed with hypertension. (*Id.* ¶ 8.) Dr. Sugarman states it is well documented people with cardiovascular disease and severe hypertension are at higher risk for dying from COVID-19. (Sugarman Cert. ¶ 19.) Moreover, Petitioner S.L. currently has flu-like symptoms, including body pain and congestion. (S.L. Cert. ¶ 8.) According to Dr. Sugarman, due to his health conditions, "Mr. S.L. is at increased risk of dying from COVID-19." (Sugarman Cert. ¶ 19.) At the hearing, the Government did not oppose Petitioner's argument hypertension places him in a high-risk category according to the CDC. But counsel informed the Court the Government nevertheless opposes release because his detention is not unconstitutional. *See supra* note 4.

Petitioner Jiaqiang X. is a 34-year-old man who is currently detained by ICE at ECCF. (Gendelman Cert. ¶ 5, ECF No. 2-7.) Mr. Xu has high blood pressure. (*Id.* ¶¶ 9-12.) He is currently on two blood pressure medications: hydrochlorothiazide and metoprolol. (*Id.* ¶ 10.) According to Dr. Sugarman, both Petitioner Jiagiang X.'s "hypertension and cardiovascular disease put him at risk of dying from COVID-19." (Sugarman Cert. ¶ 17.) At the hearing, the Government did not have any information on Petitioner's underlying conditions but did not dispute Petitioner's representations. *See supra* note 4.

Petitioner Isaias R.A. is a 39-year-old man who is currently detained by ICE at EDC. (Hughes Cert. ¶¶ 4-5, ECF No. 2-13.) Petitioner R.A. suffers from gastritis and has an infected foot. (*Id.* ¶¶ 7, 8.) He is currently suffering from a sore throat, prolonged headaches, and stomach problems including nausea. (*Id.* ¶ 8.) He is exhibiting symptoms of COVID-19, including a sore throat, some bleeding, and prolonged headaches. (*Id.*) He went to the medical unit for headaches about a week and a half ago and was given allergy medication, as well as ibuprofen and

5

acetaminophen. (*Id.*) At the hearing, Petitioner informed the Court Petitioner was presumed positive for COVID-19 but did not have information on his treatment. The Government did not have information on his positive diagnosis or other medical records. *See supra* note 4.

Petitioner Tieku A. is a 41-year-old man who is currently detained by ICE at ECCF. (Khandwala Decl. ¶ 7, ECF No. 2-15.) Petitioner Tieku A. has been diagnosed with hypertension. (*Id.*) Additionally, Petitioner Tieku A. has been experiencing ongoing respiratory symptoms, including a cough and runny nose for nearly the past four months. (*Id.* ¶ 13.) According to Dr. Sugarman, Petitioner Tieku A.'s hypertension "is a known risk factor for COVID-19." (Sugarman Cert. ¶ 19.) Similarly, his respiratory symptoms, including a cough and runny nose for nearly the past four months "make it more likely that he will be infected and die from COVID-19." (Sugarman Cert. ¶ 12.) At the hearing, the Government did not have information on his medical status, but concedes if he has those symptoms, he falls into high risk category. *See supra* note 4.

Petitioner Nery A.C.M. is a 35-year-old man who is currently detained by ICE at ECCF. (Khawam Cert. ¶¶ 5-6, ECF No. 2-14.) He struggles to breathe as a result of bronchitis, which causes him to become severely ill whenever he has an infection. (*Id.*) Petitioner Nery A.C.M. suffers from bronchitis, insomnia, and excruciating headaches. He also suffered severe injuries after falling in 2014 while working in construction, including crushed lungs. (*Id.* ¶¶ 7-8.) He almost died from his injuries and had to undergo five surgeries. Despite the operations, he has difficulty breathing from his nose. (*Id.* ¶ 8.) According to Dr. Sugarman, due to his breathing difficulties, Petitioner Nery A.C.M. is "at an even higher risk of being infected with and dying from COVID-19" because "[i]t is well documented that anyone with respiratory difficulties is at exceedingly high risk of dying from COVID-19." (Sugarman Cert. ¶ 18.) Additionally, because Petitioner Nery A.C.M. has disabilities and comorbid medical conditions, he is "at a significantly higher risk of

dying from COVID-19." (*Id.*) The Government informed the Court at the hearing ICE did not consider Petitioner Nery A.C.M. high risk based on his conditions. *See supra* note 4.

Petitioner Nicolas M.M. is a 37-year-old man currently detained at EDC. Petitioner M.M. was diagnosed with bronchitis, and his breathing problems have escalated over the past two weeks. (Gendelman Cert. ¶¶ 5, 11, ECF No. 12.) He is breathing more heavily and can hear noise in his chest. (*Id.* ¶ 11.) When he exhales completely, he feels like there is still air remaining in his lungs. (*Id.*) On March 30, 2020, his conditions required prescriptions for a nasal spray, Montelukast, and Cetirizine, and on April 1, 2020, he required treatment from a machine through which albuterol was administered. (*Id.*) According to Dr. Sugarman, Petitioner M.M. is exhibiting "symptoms of asthma and bronchitis, both of which are pulmonary diseases that create a high-risk of infection or death from COVID-19." (Sugarman Cert. ¶ 15.) The Government informed the Court at the hearing ICE determined Petitioner's breathing issues were due to spider bite, and there were no further reported problems. *See supra* note 4.

### C. Conditions at EDC and ECCF

Petitioners submitted a declaration from Dr. Allen S. Keller, an associate professor of medicine and population health at NYU School of Medicine which stated the following with regards to the conditions at both ECCF and EDC:

> Detained immigrants at Essex County Jail and Elizabeth Detention Center are housed in confined dormitory-like quarters with multiple detainees. They sleep with many detainees in close quarters. Meals are served in communal settings and so too does recreation. Both detention facilities are enclosed, prison-like facility and puts detainees in close contact around the clock. "Social Distancing COVID-19 Guidelines," as per the CDC and the White House COVID-19, are virtually impossible at both facilities . . . . It is my professional opinion that health care provided at Essex County Correctional Facility and Elizabeth Detention Center, even under normal conditions, is inadequate and raises concerns about safety.

Additionally, there are inadequacies in hygiene and sanitation.

(Keller Decl. ¶¶ 11-16, ECF No. 2-1.)

Petitioners also submit declarations regarding their experiences at the facilities. At EDC, Petitioner Melvin A.A. is confined to a "dorm" currently holding about 30 detainees, where he is confined 23 hours per day. (Hughes Decl. ¶ 5, ECF No. 2-4.) The beds are close together, the detainees are crowded in, and it is not possible for them to remain six feet apart. (*Id.*) They are all forced to eat, sleep, and go to the bathroom in the same space. (*Id.*) At one point after the beginning of the COVID-19 crisis, the detainees in his dorm were left three days without soap to wash their hands. (*Id.*) Even now, the soap is not renewed as frequently as it runs out by the sinks in the bathroom area. (*Id.*)

Petitioner Nicolas M.M. is housed at EDC and currently in a room with two other detainees. (Gendelman Decl. ¶ 10, ECF No. 2-12.) He does not have access to hand sanitizer or masks to protect himself. (*Id.*) While the facility has started limiting the number of detainees who can be in a hallway at once, dormitories are still packed with approximately forty people in each dormitory and the beds are only two or three feet apart. (*Id.* ¶ 14.) Petitioner Nicolas M.M. does not have the ability to social distance and protect himself from getting sick, whether he is in a dormitory or in isolation with other individuals. (*Id.*)

Petitioner Isaias R.A. is detained at EDC where he lives in a dorm which has the capacity to hold 40 people, and currently holds 26 people. (Hughes Decl. ¶ 5, ECF No. 2-13.) Cleaning the dorms is done by detainees, and while they have access to water to wash their hands, they do not have consistent access to soap because the staff at the detention center do not replace it immediately when it runs out. (*Id.* ¶ 6.)

At ECCF, Petitioner Jason Anthony W. lives in a "dorm," which is a room with beds for

48 detainees. (Johnson Decl. ¶ 8, ECF No. 2-6.) He reports social distancing is impossible as the detainees eat in a cafeteria-style setting and no more than 18 inches from each other and the beds are approximately 18 inches apart. (*Id.* ¶ 10.)

Petitioner Jiaqiang X. is also detained at ECCF, where he lives in a dormitory of fifty people. (Gendelman Decl. ¶ 8, ECF No. 2-7.) The dormitory has bunk beds, and he estimates they are significantly less than six feet apart. (*Id.*) He does not have access to hand sanitizer. (*Id.* ¶ 9.) He submitted a request, but his request was rejected, and he was informed washing his hands was a more effective method of disease prevention. (*Id.* ¶ 9.) He regularly washes his hands but reports there is very little water in the faucets because of attempts to conserve water. (*Id.*)

Petitioner Juan F.S.L. is also at ECCF, where he lives in a dormitory, which contains 50 or more detainees and social distancing is not possible. (Khandwala Decl. ¶¶ 9-10, ECF No. 2-8.) He reports no one is taking detainees' temperatures regularly, and there is no information on how many detainees have been tested for flu or COVID-19, even when they exhibit symptoms consistent with those conditions. (*Id.* ¶ 13.) While the guards have recently been provided with masks and gloves, this has not been the case for detainees. (*Id.* ¶ 14.)

Petitioner Tieku A. is detained at ECCF in Dorm 2, which contains about 50 detainees. (Khandwala Decl. ¶ 14, ECF No. 2-15.) He reports social distancing is not occurring and is practically impossible. (*Id.* ¶ 16.) A detainee who slept only 2 feet away from Petitioner Tieku A. was recently removed from Dorm 2 and quarantined. (*Id.* ¶ 17.) Detainees all use one bathroom, they all sit together, they do not have liquid soap, only bar soap, there is no hand sanitizer, no wipes, and detainees are the only ones who clean the dorm floors, tables, phones, and bathrooms with little bottles of liquid soap. (*Id.* ¶ 18.) Guards and nurses have recently been provided with masks and gloves, but this has not been the case for detainees, who sometimes use their own socks

9

to hold the phone to prevent exposure to COVID-19. (*Id.* ¶ 19.)

Respondents submitted declarations from the directors of both ECCF and EDC regarding the policies and protocols that have been implemented. Judge Vasquez summarized the ECCF director's declaration as follows:[5]

> Respondents submitted a declaration from Alfaro Ortiz, the Director of the ECCF. D.E. 17-1. On the date of Ortiz's declaration, April 6, 2020, two ICE detainees had tested positive for COVID-19 as had seven inmates in a different building, ten members of the ECCF correctional staff, and one nurse. *Id.* at ¶ 22. Ortiz details the efforts of ECCF to deal with the virus. Ortiz reports that ECCF is currently at seventy-five percent of its capacity and that dorms that were designed to hold sixty detainees now house a maximum of forty-eight. *Id.* at ¶¶ 4-5. He states that ECCF has provide informational hand-outs as to COVID-19 and that detainees have space to "sit at least six feet apart." *Id.* at ¶ 6. Health care at ECCF is administered by CFG Health Systems, with a physician on-site for sixteen hours a day (and available twenty-four hours) as well as nurse practitioner and two RNs and LPNs at all times. *Id.* at 9-10. New detainees are "screened for disabilities upon admission and their temperatures are checked." *Id.* at ¶ 8. ECCF is able to re-circulate air within the facility every four hours. *Id.* at ¶ 13. Among other measures instituted in response to COVID-19, ECCF educates detainees as to the "importance of hand washing and best practices to prevent the spread of COVID-19" and provides detainees daily access to sick call. *Id.* at ¶ 15. ECCF also sanitizes its kitchen hourly, hired additional cleaning staff, and implemented health screening for officers. *Id.* New detainees are quarantined for 14 days. *Id.* If a detainee exhibits COVID-19 symptoms, he or she is medically evaluated and provided a surgical mask. *Id.* at ¶ 17. Detainees with moderate to severe symptoms are immediately taken to University Hospital, while those with mild symptoms are quarantined. *Id.* at ¶ 18. As of April 6, ECCF had 85 inmates and detainees in quarantine. *Id.* at 19. Detainees who have had a known exposure to COVID-19 but who are asymptomatic are "cohorted," meaning that they are placed with other similar individuals for fourteen days. *Id.* at ¶ 20.

*Rafael L.O.*, No. 20-3481, 2020 WL 1808843, at \*4. As of 9:00 a.m. on April 11, 2020, ECCF

---

[5] Respondents submitted the same April 6, 2020 Second Amended Declaration from Alfaro Ortiz in this case and in *Rafael L.O.*, No. 20-3481, 2020 WL 1808843.

identified the following cases of COVID-19, confirmed by testing, amongst ECCF inmates, detainees, and staff: (a) two ICE detainees who were previously in medical observation at University Hospital who the hospital cleared for discharge released back into ECCF custody; those ICE detainees are now in isolation1; (b) six inmates (non-ICE detainees) who are housed in a separate building than ICE detainees; (c) thirty-six members of the ECCF correctional staff, none of whom are presently at ECCF; and (d) one nurse who is also not at ECCF. (Opp. 10.)

For the EDC, Respondents submit a declaration from Captain Abelardo Montalvo, M.D., the Eastern Regional Clinical Director with ICE Health Service Corps ("IHSC"), who oversees EDC as one of his facilities. (ECF No. 16-16.) According to Dr. Montalvo, EDC has the capacity to hold 304 detainees and currently holds 143. (Montalvo Decl. ¶ 6.) During intake of an ICE detainee, a nurse conducts a medical screening. (*Id.* ¶ 10.) In cases of known exposure to a person with confirmed COVID-19, asymptomatic detainees are placed in cohorts with restricted movement for the duration of the most recent incubation period (14 days after most recent exposure to an ill detainee) and are monitored daily for fever and symptoms of respiratory illness. (*Id.* ¶ 14.) Any detainee with a medical condition outside the scope of the clinic will be sent out (with mask for confirmed COVID-19 and/or advanced symptoms of the virus). (*Id.* ¶ 14.) All confirmed positive cases of COVID-19 remain in the same dorm. (*Id.*) These detainees are afforded daily sick call in the dorm and mandated daily monitoring with temperature checks. (*Id.*) EDC provides daily 24-hour access to sick calls in a clinical setting but does not have an onsite medical infirmary; it provides referrals to local hospitals for specialty medical care. (*Id.* ¶ 15.)

Soap is provided in the dorms and soap and hand sanitizer is available in the medical clinic. (*Id.* ¶ 19.) EDC provides disinfectants to staff and cleaning crews and CDC recommended cleaning and disinfection above and beyond normal activity have been implemented. (*Id.* ¶ 20.)

11

Core Civic[6] staff are provided with face masks; and are also allowed to bring their own. (*Id.*) Staff have N-95 Masks and other PPE available (*Id.* ¶ 20.) Core Civic was reported to be expecting a delivery of masks, to be utilized by the detainee population, sometime between April 9, 2020 and April 14, 2020. Once received all detainees will be provided with masks. (*Id.* ¶ 21.) During meals EDC ensures detainees are kept at least six feet apart from each other. (*Id.* ¶ 26.) All group activities besides limited outside time and dining have been temporarily suspended. (*Id.* ¶ 28.) EDC ensures detainees' bunks are adequately spaced apart and at least six feet apart in all directions. (*Id.* ¶ 29.)

As of 11 a.m. on April 10, 2020, there are 7 confirmed positive for COVID-19 cases in the detainee population at EDC; 1 suspected detainee cases; 1 confirmed positive on the EDC staff; 1 suspected staff positive case. (*Id.* ¶ 16.)

## II. JURISDICTION

At the outset, Respondents argue Petitioners' claims are based on conditions of confinement and therefore not properly brought in a habeas petition. (ECF No. 16 at 11-14.) The Court finds Judge Arleo's recent holding in *Cristian A.R. v. Decker*, Civil Action No. 20-3600 on this issue persuasive:

> Respondents argue that Petitioners cannot succeed on their conditions of confinement and medical claims because such challenges are not properly brought through habeas. Federal courts, however, including the Third Circuit, have condoned conditions of confinement challenges through habeas. *See Aamer v. Obama*, 742 F.3d 1023, 1032 (D.C. Cir. 2014); *see also Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 242-44 (3d Cir. 2005); *Ali v. Gibson*, 572 F.2d 971, 975 n.8 (3d Cir. 1978). Likewise, the Supreme Court has repeatedly left open the question of whether detainees may challenge their confinement conditions via a petition for a writ of

---

[6] It does not appear Dr. Montalvo or Respondents identify "Core Civic." The Court can only assume it refers to employees at EDC.

habeas corpus. *See Bell v. Wolfish*, 441 U.S. 520, 526, n.6 (1979)
("[W]e leave to another day the question of the propriety of using a
writ of habeas corpus to obtain review of the conditions of
confinement."); *Preiser v. Rodriguez*, 411 U.S. 475, 499 (1973)
("When a prisoner is put under additional and unconstitutional
restraints during his lawful custody, it is arguable that habeas corpus
will lie to remove the restraints making custody illegal."); *Ziglar v.
Abbasi*, 137 S.Ct. 1843, 1862-63 (2017) (explaining that the habeas
remedy, if necessity required its use, would have provided a faster
and more direct route to relief for immigration detainees challenging
a detention policy than a suit for money damages, as a successful
habeas petition would have required officials to place respondents
in less-restrictive conditions immediately).

Furthermore, under 28 U.S.C. § 2241, a district court may exercise
jurisdiction over a habeas petition when the petitioner is in custody
and alleges that his custody violates the Constitution, laws, or
treaties of the United States. *See* 28 U.S.C. § 2241(c); *Maleng v.
Cook*, 490 U.S. 488, 490 (1989). Petitioners in this action claim that
their continued detention in their current conditions of confinement
violates due process. Accordingly, this Court finds that Petitioners
may challenge their conditions of confinement through a 28 U.S.C.
§ 2241 petition for writ of habeas corpus.

(*Id.* at ECF No. 26 at 16-17.)

Courts elsewhere in the Third Circuit have also come to this conclusion after reviewing

applicable Supreme Court and Third Circuit precedent. *See Camacho Lopez v. Lowe*, No. 20-563,

2020 WL 1689874, *4-6 (M.D. Pa. Apr. 7, 2020); *Verma v. Doll*, No. 20-14, 2020 WL 1814149,

at *4 (M.D. Pa. Apr. 9, 2020). The Court concurs with the reasoning of these decisions and finds

Petitioners may challenge their conditions of confinement in this habeas petition.

## III. Legal Standard

Injunctive relief is "an extraordinary remedy" and "should be granted only in limited

circumstances." *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426-

27 (3d Cir. 1994) (internal quotation marks omitted); *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d

700, 708 (3d Cir. 2004). To obtain a temporary restraining order, the moving party must show:

> (1) a reasonable probability of eventual success in the litigation, and
> (2) that it will be irreparably injured . . . if relief is not granted. . . .
> [In addition,] the district court, in considering whether to grant a
> preliminary injunction, should take into account, when they are
> relevant, (3) the possibility of harm to other interested persons from
> the grant or denial of the injunction, and (4) the public interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (quoting *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974)). The movant must, as a threshold matter, establish the two "most critical" factors: reasonable probability of eventual success in the litigation and irreparable harm. *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). Under the first factor, the movant must show that "it can win on the merits." *Id.* This showing must be "significantly better than negligible but not necessarily more likely than not." *Id.* The second factor carries a slightly enhanced burden: the movant must establish it is "more likely than not" to suffer irreparable harm absent the requested relief. *Id.* If these "gateway factors" are satisfied, the Court considers the third and fourth factors, which aim to balance the equities by examining the potential for harm to others if relief is granted and whether the public interest favors injunctive relief. *Id.* at 176, 179. The Court must then balance all four factors to determine, in its discretion, whether the circumstances warrant injunctive relief. *Id.* at 179.

## IV. DECISION

### A. Temporary Restraining Order

#### 1. Reasonable Probability Of Eventual Success In The Litigation

In their Petition, all Petitioners argue Respondents have violated their substantive due process rights by exposing them to a risk of COVID-19, in light of their medical conditions. (Pet. ¶¶ 101-116.)

The Court starts its discussion with an examination of the Supreme Court's case in *Helling*

*v. McKinney*, 509 U.S. 25, 33 (1993). In *Helling*, the plaintiff was a prisoner whose cellmate was a heavy smoker. Plaintiff filed a civil rights action arguing he had been involuntarily exposed to levels of secondhand smoke that posed an unreasonable risk of harm to his future health. While weighing plaintiff's conditions of confinement claim, the Court recognized inmates are entitled to relief under the Eighth Amendment where they prove threats to personal safety from the exposure to serious contagious diseases. *Helling*, 509 U.S. at 33 (noting that the Eighth Amendment requires a remedy when "inmates in punitive isolation were crowded into cells and some of them had infectious maladies such as hepatitis and venereal disease" (citing *Hutto v. Finney*, 437 U.S. 678, 682 (1978))). The Court further held: "[n]or can we hold that prison officials may be deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms." *Id.*

Though *Helling* is a conditions of confinement claim by a sentenced prisoner, and therefore arises under the Eighth Amendment, its reasoning is nonetheless relevant here in the context of an immigration detainee. Because Petitioner is a detainee, not a convicted prisoner, his claim is one grounded in due process, not the Eighth Amendment. The Third Circuit has made clear immigration detainees are entitled to the same due process protections as pre-trial detainees when raising conditions of confinement due process claims. *E. D. v. Sharkey*, 928 F.3d 299, 306–07 (3d Cir. 2019). "[W]hen pretrial detainees challenge their conditions of confinement, we must consider whether there has been a violation of the Due Process Clause . . . ." *Hubbard v. Taylor*, 538 F.3d 229, 231 (3d Cir. 2008). "In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicated only the protection against deprivation of liberty without due process of law, we think the proper inquiry is whether those conditions amount to punishment of the detainee." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Under *Bell*, a "particular measure amounts

to punishment when there is a showing of express intent to punish on the part of detention facility officials, when the restriction or condition is not rationally related to a legitimate non-punitive government purpose, or when the restriction is excessive in light of that purpose." *Bistrian v. Levi*, 696 F.3d 352, 373 (3d Cir. 2012). The Court's "inquiry into whether given conditions constitute 'punishment' must consider 'the totality of circumstances within an institution.'" *Hubbard*, 399 F.3d at 160 (quoting *Union Cty. Jail Inmates v. DiBuono*, 713 F.2d 984, 996 (3d Cir. 1983)).

As other courts in this district recently found in *Rafael L.O. v. Tsoukaris*, Civil Action No. 20-3481 and *Cristian A.R. v. Decker*, Civil Action No. 20-3600, there is no express intent to punish here. But even without express intent to punish under *Bell*, there can still be a showing of punishment "when the restriction or condition is not rationally related to a legitimate non-punitive government purpose, or when the restriction is excessive in light of that purpose." *Bistrian v. Levi*, 696 F.3d 352, 373 (3d Cir. 2012).

In *Rafael L.O.*, Judge Vasquez found the conditions of confinement at ECCF, including the number of detainees confined to limited living and sleeping quarters, limited access to hygiene products, shared bathroom facilities, and the transmission of COVID-19 to detainees in custody, amounted to punishment of the Petitioners, who had underlying medical conditions making them vulnerable to serious complications or death if they contract the virus. *Rafael L.O.*, 2020 WL 1808843, at *7-8. Judge Arleo found the same in *Cristian A.R.* when evaluating the conditions at the Bergen County Facility and Hudson County Facility. *See generally*, *Cristian A.R.*, Civ. A. No. 20-3600, ECF No. 26. There, Petitioners spend 23.5 hours a day in small cells they share with another person and the remaining thirty minutes out of their cells in common areas. *Id.* at 21-24. The time outside the cells includes use of common facilities, which are frequently used and cleaned at unspecified times. Detainees lacked sufficient, and sometimes any, soap. (*Id.*) In light of the

16

conditions at the facilities, the gaps in the Government's protocols and the detainees' underlying medical conditions, both courts concluded the detainees were subjected to "punishment." *Rafael L.O.*, 2020 WL 1808843, at *7-8; *Cristian A.R.*, Civil Action No. 20-3600, ECF No. 26 at 21-25.

The Court finds similarly here. With the exception of Petitioner Neary C.M., the Government conceded if Petitioners medical conditions are as stated, they would fall into high risk categories for severe COVID-19 illness.[7] For people in the highest risk populations, the fatality rate of COVID-19 infection is about 15 percent. (Franco-Paredes Declaration 2:9-11, ECF No. 2-9). While the Court commends the steps both facilities have taken to control the spread of the virus, there nonetheless remain gaps leaving these medically vulnerable individuals at risk.

Specifically, detainees at ECCF sleep in pods with 47 other individuals and a recreation area in the center. (Ortiz Decl. ¶ 6.) While detainees apparently have the ability to sit six feet apart in the pods, there is no mention of the arrangement of the beds. Other inmates at ECCF are in two-man cells, with bunk beds not allowing for six feet of space. (*Id.*) Director Ortiz states ECCF has developed a protocol for individuals with underlying health conditions. (*Id.* ¶ 15(f).) This protocol includes daily monitoring of these inmates and detainees, and the establishment of a plan to remove the inmates from the rest of the population "should the need arise." (*Id.*) While certainly any additional monitoring is beneficial, it does not address the core issue of preventing the disease for these individuals. Director Ortiz states all housing units are sanitized three times per day, but there is no discussion of cleaning of common areas. (*Id.* ¶ 15(m).) Detainees who are exhibiting symptoms are given masks (*Id.* ¶ 17), but it is well documented asymptomatic individuals can infect others. In fact, as acknowledged in Director Ortiz's declaration, one individual who tested

---

[7] While the Government stated ICE did not consider him to be high-risk, they do not point to any support for this statement.

positive had normal vital signs, and it was only discovered he was positive when he went to the hospital for a laceration. (*Id.* ¶ 22 n.1.) Under ECCF's own protocols, nothing would have prevented this individual from interacting with high-risk individuals and unknowingly infecting him or her.   Finally, none of the statements in Director Ortiz's declaration contradict the detainee's statements regarding the space between beds; the limited amount of soap and no sanitizer; and the cleaning of common areas which is done by detainees using only soap.

At EDC, they state they have a "special protocol" for high risk detainees, but much like ECCF, it only consists of mandatory daily temperature monitoring. (Montalvo Decl. ¶ 14.) He states "[s]oap is provided in the dorms, and soap and hand sanitizer are available in the medical clinic," but this does not address whether detainees have access to soap at all times. (*Id.* ¶ 19). Detainees still gather for meals, and even though Director Montalvo states chairs are placed six feet apart, there is no indication detainees are able to maintain social distance at all times in this area. (*Id.* ¶ 27.) Detainees are also together during "limited outdoor time." (*Id.* ¶ 28.) He further states "CDC recommended cleaning and disinfection above and beyond normal activity have been implemented" but provides no further information about how often each area of the facility is cleaned and disinfected. (Id. ¶ 20.) While they are "expecting" a delivery of masks for the detainees (*Id.* ¶ 21), there is no indication the masks have arrived; how many will be available; how often the detainees can obtain new ones; whether detainees will be required to wear them at all times, etc. Moreover, none of the statements in Director Montalvo's declaration contradict the detainee's statements they are confined in pods for 23 hours per day; all forced to eat, sleep, and go to the bathroom in the same space; cleaning is done by detainees; no access to hand sanitizer; at one point after the beginning of the COVID-19 crisis, detainees were left for three days without soap to wash their hands; and even now, the soap is not renewed as frequently as it runs out by the sinks in the

18

bathroom area.

Viewing the totality of the circumstances at both facilities, and taking into consideration the documented medical conditions of Petitioners, the Court finds Petitioners are likely to succeed on their substantive due process claim. While EDC and ECCF have made great efforts to control the spread of COVID-19, without the ability to practice good hygiene and social distancing as recommended to stop the spread, these medically vulnerable Petitioners nonetheless remain unprotected.

### 2. Irreparable Harm

The second prong of the balancing test for a TRO requires a movant to establish he or she is "more likely than not" to suffer irreparable harm absent the requested relief. *See Reilly*, 858 F.3d at 179. The Court finds Judge Vasquez's holding on this ground particularly relevant:

> The Court has already explained the seriousness of the Covid-19 pandemic and its rapid proliferation in this nation. Nonetheless, the Court will provide these sobering nationwide and county-wide confirmed case and death rates as a reminder. As of April 8, 2020, the United States has 425,000 confirmed cases and more than 14,000 deaths. And in what is New Jersey's second-most afflicted county, Essex, there are 5,078 confirmed cases and 232 deaths. Even more concerning, the state's projected peak is likely still weeks away.
>
> As noted earlier in this opinion, in addition to the volume of ECCF detainees confined to inherently limited living and sleeping quarters, they also appear to have limited access to hygiene products and must share bathroom facilities with a large number of persons. Moreover, given the timing of the first confirmed case at ECCF, it appears the detainee contracted the virus while in ECCF's jurisdiction.
>
> The previously described conditions of confinement raise serious concerns about the ability to stop transmission of the virus. With the conditions as currently described, at-risk detainees – including Petitioners -- cannot practically adhere to social distancing guidelines or the adequate level of personal hygiene, that have been touted as the most effective means to thwart the spread of the virus. Against this backdrop, Petitioners have demonstrated irreparable

> harm should they remain in confinement. *See Thakker*, 2020 WL
> 1671563 at *7 ("[C]atastrophic results may ensue, both to
> Petitioners and to the communities surrounding the Facilities."); *see
> also Hope v. Doll*, Civ. No. 1:20-562 J.E.J. (M.D. Pa. Apr. 7, 2020)
> ("We cannot allow the Petitioners before us, all at heightened risk
> for severe complications from COVID-19, to bear the consequences
> of ICE's inaction.") The Court therefore finds that Petitioners have
> demonstrated irreparable harm should they remain in ECCF.

*Rafael L.O.*, 2020 WL 1808843, at *8. This Court agrees. Taking into consideration the

dangerousness and contagiousness of this disease, Petitioners' particular underlying medical

conditions and the conditions in which they are being held at EDC and ECCF, the Court finds they

have established they are more likely than not to suffer irreparable harm if they remain detained.

*See Coronel*, 2020 WL 1487274, at *8 (finding "[d]ue to their serious underlying medical

conditions" and their placement in immigration detention, where they are "at significantly higher

risk of contracting COVID-19," the petitioners "face a risk of severe, irreparable harm").[8]

### 3. Balancing of Equities and Public Interest

"Before granting an injunction, a district court must balance the relative harm to the parties,

*i.e.*, the potential injury to the plaintiff if an injunction does not issue versus the potential injury to

the defendant if the injunction is issued." *Novartis Consumer Health, Inc. v. Johnson & Johnson-*

*Merch Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) (internal citation omitted). For the

reasons outlined above, the Court finds the potential of injury to Petitioners is high. However,

"ICE undoubtedly has a legitimate interest in ensuring that the petitioners do not flee and in

---

[8] Respondent's opposition to this ground for relief is not clear. It appears they are arguing
Petitioners' injury is speculative. (Opp. 15.) The Court does not agree. As the Supreme Court
observed in *Helling*, "it would be odd to deny an injunction to inmates who plainly proved an
unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to
them." 509 U.S. at 33 (noting "the Courts of Appeals have plainly recognized that a remedy for
unsafe conditions need not await a tragic event"). Moreover, the Court has outlined the many
reasons why injury is not speculative in this case.

protecting the public." *See Rafael L.O.*, 2020 WL 1808843, at \*9. The Court also finds the public has an interest in preventing the further spread of COVID-19 and preserving critical resources. *Id.* However, the Court believes it can address Respondent's very important interests in fashioning appropriate conditions of release for each Petitioner.

Petitioner Jason Anthony W. has felony convictions from several years ago involving controlled substances. (Opp., Ex. C.) Petitioner Jiaqiang X. was convicted of several white collar crimes which did not involve violence. (*Id.*, Ex. F.) Notably, Petitioner Jiaqiang X. does not oppose removal and, in fact, is actively trying to return to his home country of China. Petitioner Nery A.C.M. was arrested in September 2019 for domestic violence, but the charge was later dropped. Petitioner Nicolas M.M. was arrested on March 27, 2019, for check forgery and has public order convictions in 2016 and 2019, as well as a driving under the influence conviction from over a decade ago. As discussed in the attached order, for those with the most serious criminal histories, the Court will impose the most stringent conditions of release, including electronic monitoring.

### B. Extraordinary Circumstances Justify Releasing Petitioners from Detention

As also found by the courts in *Rafael L.O.* and *Cristian A.R.*, Petitioners in this matter are "vulnerable to severe complications and death if they contract COVID-19 and are incarcerated in Facilities at the epicenter of the outbreak where they cannot practically adhere to social distancing guidelines or the adequate level of personal hygiene to stop the spread of the virus. These facts warrant the extraordinary remedy of release on bail, and make bail necessary, to make the habeas remedy effective." *Cristian A.R.*, Civil Action No. 20-3600, ECF No. 26 at 29; *see also Rafael L.O.*, 2020 WL 1808843, at \*5; *Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992) (indicating that a court may only grant release pending a disposition of federal habeas claims when the petitioner has raised "substantial constitutional claims upon which he has a high probability of

success, and . . . when extraordinary or exceptional circumstances exist which make the grant of

bail necessary to make the habeas remedy effective") (citation omitted)).

## V. CONCLUSION

For the foregoing reasons, Petitioner's motion for a TRO (ECF No. 5) is **GRANTED** as to

Petitioners Jason Anthony W., Jiaqiang X., Tieku A., Nery A.C.M. and Nicolas M.M., who shall

be released subject to the conditions as ordered. Decision is **RESERVED** and the Court will order

expedited supplemental briefing regarding Petitioners Melvin A.A., Juan F.S.L. and Isaias R.A.

An appropriate Order accompanies this Opinion.

Date: April 17, 2020

*/s/ Brian R. Martinotti*
**HON. BRIAN R. MARTINOTTI**
**UNITED STATES DISTRICT JUDGE**